RAFKIN ESQ., PLLC
SETH A. RAFKIN (199166)
(srafkin@rafkinesq.com)
JENNIFER M. BOGUE (259431)
(jbogue@rafkinesq.com)
1201 SUSSEX TURNPIKE, SUITE 102
RANDOLPH, NJ 07869
Telephone:     (973) 891-3370
Facsimile:     (973) 920-9727

Attorneys for PLAINTIFF

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. _____

DOROTHEA STOLL,       )
                      )
          Plaintiff,  )
                      )
     v.               )     **COMPLAINT**
                      )     (Jury Trial Demanded)
RIMINI STREET, INC.   )
                      )
          Defendant.  )

Plaintiff DOROTHEA STOLL, as a complaint against RIMINI STREET, INC., alleges and states the following:

**<u>NATURE OF THE CASE</u>**

1.     This case is about the retaliation one woman faced when she had the temerity to insist that a claim of workplace harassment be investigated at RIMINI STREET, INC. -- a publicly traded, global provider of enterprise software services.  While RIMINI STREET's Human Resources and Legal Departments were content to do nothing, Plaintiff DOROTHEA STOLL, a senior executive, did what the law requires all employer to do in the face of a claim of harassment: she conducted a thorough, unbiased investigation.

2.     One would think RIMINI STREET would have applauded and appreciated Plaintiff's efforts.  It didn't.  Instead, Plaintiff was summoned to a meeting with her boss and RIMINI

1

PLAINTFF'S COMPLAINT

STREET's Chief Human Resources Officer JULIE MURPHY.  Stunningly, MURPHY rebuked Plaintiff telling her that her investigation "went too deep."  Her boss readily echoed the statement.

3.      Plaintiff was then ordered to turn over all of her extensive investigation documentation.  In a matter of a few short months, Plaintiff was summarily fired, ostensibly because she was no longer a good "fit" – even though she had met and exceeded every objective performance goal she had at RIMINI STREET and earned 100% of her target for every single bonus cycle preceding her investigation.  A more glaring case of retaliation is difficult to imagine.

4.      Unbeknownst to Plaintiff, it turned out that the conclusion of her investigation undermined the predetermined outcome already reached by RIMINI STREET's Legal and Human Resources Departments.  Those Departments had determined to fire the man who was the subject of the harassment complaint.  Yet, neither the Human Resources nor the Legal Department had bothered to actually investigate the issue.

5.      When by chance the issue reached Plaintiff, she did what the company had trained her to do, what the law requires and what Human Resources should have already done: she investigated.  As a high level executive, Plaintiff had received repeated training regarding an employer's obligation to investigate claims of harassment.

6.      Plaintiff conducted a thorough investigation.  The evidence discovered did not substantiate the claim.  A woman had complained that a man in her office talked to her too much, got too close when they were speaking and touched her arm and back.  Plaintiff interviewed the other eight women in the same group.  Each one emphatically denied that the man at issue had ever been anything other than 100% professional.  Indeed, these women described him in terms such as, consistently "polite," "kind," "courteous," "one of the best bosses I've ever had," etc. and that he had never engaged in any inappropriate conduct whatsoever.

PLAINTFF'S COMPLAINT

7.      Furthermore, several of these women were present when certain of the alleged conduct purportedly occurred.  Yet, each of them denied having seen any inappropriate conduct. And, not only did the investigation yield no evidence supporting the claim of harassment, it revealed that the woman making the complaint had a well-earned reputation for holding grudges against and being unprofessional to coworkers.

8.      All of this, of course, begs the question: why would Legal and Human Resources fail to investigate and rush to judgment.  The answer is that the woman who complained was part of the pet team of RIMINI STREET's CHIEF EXECUTIVE OFFICER, SETH RAVIN.  She worked in RIMINI STREET's Las Vegas headquarters.  CEO RAVIN was based there too.  RAVIN had made no bones about his affinity for the Vegas office and the team he protected there.  The woman who complained was part of that team. The man she complained about was not.  He had been hired by others much later and, in fact, never met RAVIN.

9.      As noted, Plaintiff was sternly rebuked by the head of Human Resources, JULIE MURPHY because her investigation "went too deep."  Plaintiff was ordered to turn over all of her investigation documentation.  What followed was text book retaliation.

10.      First, Plaintiff's boss gave her a low bonus.  Up until this point, Plaintiff had always received positive performance feedback and 100% of her bonus targets.  When Plaintiff asked why her bonus was low – the first one since MURPHY told her she had gone "too deep" – her boss told her that suddenly there was a negative "perception" about her team and her leadership.  When Plaintiff pressed him for details and support for that statement, he could provide none.  He could not point to any objective performance issues because Plaintiff, as she had throughout her tenure at RIMINI STREET, had met and exceeded those. And, RAVIN himself had approved bonuses for all other members of Plaintiff's team for the same cycle.  Those bonuses were at 100% or more of target.

3

PLAINTFF'S COMPLAINT

11.     Next, Plaintiff's boss steadily iced her out.  He missed numerous of their regularly scheduled meetings, whereas prior to Plaintiff going "too deep" he had consistently made those meetings.  He also went silent on other business-related matters.  Further, Plaintiff received not a word regarding her investigation or what happened since she had turned over her documentation as ordered.

12.     In addition, Chief Human Resources Officer JULIE MURPHY intervened to stop the promotion of a woman supported by Plaintiff.  Plaintiff had already sought *and obtained* approval for the promotion.  MURPHY, however, stepped in and killed the promotion.  MURPHY said the woman had not been with the company long enough to be promoted.  Yet, MURPHY had supported the promotion, not once but twice, of a woman, who had been with the company less time than the woman supported by Plaintiff.  The difference?  The woman promoted *twice* in even less time was hand-picked by CEO RAVIN, whereas the woman whose promotion MURPHY killed reported to Plaintiff and was one of the witnesses in the investigation.

13.     In the final blow, just a few months since Plaintiff had gone "too deep," she was summarily fired.  Plaintiff called her boss for what was scheduled as a routine 1:1 meeting.  When Plaintiff joined the call, however, her boss advised her that a junior member from the Human Resources Department was also on the call, i.e., one of JULIE MURPHY's underlings.  Plaintiff was told that she was fired effective immediately.  Neither her boss nor the woman from Human Resources provided any specific reason.  Instead, they told Plaintiff that she was no longer a good "fit."  A more vague reason is difficult to imagine, especially given Plaintiff's track record of nothing but achieving successful, objective results at RIMINI STREET.  Indeed, if Plaintiff was such a bad "fit," why did RIMINI STREET award her 100% of her bonus targets for each and every one of bonus cycles occurring before Plaintiff "went too deep"?

PLAINTFF'S COMPLAINT

**PARTIES**

14.    Plaintiff DOROTHEA STOLL is a resident of the State of Illinois.  She is an experienced technology and finance executive.  Prior to joining RIMINI STREET she was a successful executive at several other reputable firms, where she performed admirably.  To take one example, when the Kraft and Heinz companies merged, it was Plaintiff who was called on to lead their integration into a single SAP platform.

15.    Defendant RIMINI STREET, INC. ("RIMINI STREET") is a corporation formed under the laws of the State of Delaware with its principal place of business in California located in the City of Pleasanton, County of Alameda.  RIMINI STREET is one of the world's leading providers of third party software support.

**JURISDICTION AND VENUE**

16.    Subject matter jurisdiction over this action is conferred upon and vested in this Court under 28 U.S.C. § 1331 and 1332.

17.    Jurisdiction exists under 28 U.S.C. § 1331 because the claims set forth arise under the federal statutes known as Title VII and the Equal Pay Act.

18.    Jurisdiction exists under 28 U.S.C. § 1332 because the requisites for diversity jurisdiction are met.

    a.   The parties are citizens of different states. Plaintiff  is and at all times relevant hereto was, a citizen of the State of Illinois.  Defendant RIMINI STREET is a corporation formed under the laws of the State of Delaware, and headquartered in Las Vegas, Nevada.

    b.   The amount in controversy exceeds $75,000 exclusive of fees and costs.  Among other things, Plaintiff seeks damages for lost wages and benefits, which exceeded

PLAINTFF'S COMPLAINT

two hundred and fifty thousand dollars annually at RIMINI STREET, as well as damages for emotional distress, humiliation and punitive damages.

19.     This Court has personal jurisdiction over RIMINI STREET.  The company maintains a large office in Pleasanton, California, which is its principal place of business in the State of California and from which it regularly conducts business in the state.

20.     Venue is proper in this Court.  A substantial part of the events giving rise to the claims occurred in this district, i.e., decisions by RIMINI STREET regarding Plaintiff's employment were made within this district.  For example, Plaintiff's boss and the Chief Human Resources Officer JULIE MURPHY are based in the Pleasanton, California office.

21.     Plaintiff has filed charge of retaliation with the Equal Employment Opportunity Commission and received a Right to Sue Notice.

## FACTUAL ALLEGATIONS

22.     Plaintiff was recruited by RIMINI STREET and joined the company in early 2019. Prior to joining RIMINI STREET, Plaintiff had earned a reputation as a high performing technology executive.  She had succeeded in executive positions at companies such as Hospira and The Kraft Heinz company.  Indeed, following the merger of Kraft and Heinz, the combined company turned to Plaintiff to lead its integration into a single SAP platform.

23.     True to form, Plaintiff got off to a successful start at RIMINI STREET.  She was hired as its Vice President, Global Service Delivery Operations.  In addition, she served as the Chief of Staff to RIMINI STREET's Executive Vice President for Global Service Delivery, BRIAN SLEPKO.

24.     In her role, Plaintiff was at the heart of RIMINI STREET's operations.  She was one of the key executives charged with formulating and implementing the company's core business

6

PLAINTFF'S COMPLAINT

plans and objectives on a global scale.  She was assigned objective performance criteria, which was tied to quarterly bonus cycles.

25.     By any measure, Plaintiff succeeded.  She was awarded 100% of each and every bonus cycle.  She received nothing but positive performance feedback.  At least until mid-February of 2020.

26.     In early February 2020, Human Resources let Plaintiff know that an employee had complained about harassing behavior by a male employee in Plaintiff's group.  Plaintiff was distressed to learn that not only had nothing been done to investigate the complaint, but that Human Resources did not plan to do so, telling Plaintiff "it doesn't look like there will be an investigation." Plaintiff was then in the awkward position of having to be the one to stress *to Human Resources* that the matter had to be investigated immediately  Yet, Jessica, the person form Human Resources, sought to delay.  She told Plaintiff that she would be leaving early that day and that it looked like Plaintiff's calendar was full anyway.

27.     Plaintiff, a seasoned executive, was well aware of the obligation for a company to investigate claims of workplace harassment promptly and thoroughly.  Moreover, Plaintiff was concerned that improper conduct could be occurring within her group and wanted to ensure that employees felt safe.  Plaintiff was distressed to learn that the complaint had been languishing for nearly two weeks with no action by Human Resources and that Jessica appeared to have no sense of urgency about the matter.

28.     Plaintiff immediately talked to witnesses, including the woman raising the complaint, who was based in Las Vegas.  And, indeed, Plaintiff talked to every woman in the same Las Vegas group.  Plaintiff took copious notes and generated a 19-page investigation report in less than a week.  Plaintiff dutifully informed Jessica in Human Resources of her efforts.

PLAINTFF'S COMPLAINT

29.     What followed was surreal. Plaintiff's boss called her and told her emphatically not to forward her investigation documentation to anyone.  Plaintiff was then directed to join a call the following day with her boss and RIMINI STREET's Chief Human Resources Officer JULIE MURPHY.  Stunningly, MURPHY rebuked Plaintiff telling her that her investigation "went too deep."  Her boss readily echoed the statement.  Plaintiff was dumbfounded.  When she tried to get them to explain their concern, she was met with no explanation.  Instead, MURPHY continued to say that Plaintiff "went too deep" and attempted to pressure Plaintiff into admitting wrongdoing. Her boss, rather than supporting her, only echoed MURPHY.

30.     MURPHY then ordered Plaintiff to turn over all of her extensive investigation documentation.  In a matter of a few short months, Plaintiff was summarily fired, ostensibly because she was not a good "fit" – even though she had met and exceeded every objective performance goal she had at RIMINI STREET and earned 100% of her target for each bonus cycle preceding her investigation.  A more glaring case of retaliation is difficult to imagine.

31.     Unbeknownst to Plaintiff, it turned out that the conclusion of her investigation undermined the predetermined outcome already reached by RIMINI STREET's Legal and Human Resources Departments.  Those Departments had determined to fire the man who was the subject of the harassment complaint.  Yet, neither the Human Resources nor the Legal Department had bothered to actually investigate the issue.

32.     As noted, however, when the issue reached Plaintiff, she did what the company had trained her to do, what the law requires and what Human Resources should have already done: she investigated.  Her investigation was thorough.  The evidence discovered did not substantiate the claim.  A woman had complained that a man in her office talked to her too much, got too close when they were speaking and touched her arm and back.  Plaintiff interviewed the other eight women in the same Las Vegas group. Each one emphatically denied that the man at issue had ever

8

PLAINTFF'S COMPLAINT

been anything other than 100% professional.  Indeed, these women described him in terms such as, consistently "polite," "kind," "courteous," "one of the best bosses I've ever had," etc. and that he had never engaged in any inappropriate conduct whatsoever.

33.     Furthermore, several of these women were present when certain of the alleged conduct purportedly occurred.  Yet, each of them denied having seen any inappropriate conduct. And, not only did the investigation yield no evidence supporting the claim of harassment, it revealed that the woman making the complaint had a well-earned reputation for holding grudges against and being unprofessional to coworkers.

34.     All of this, of course, begs the question: why would Legal and Human Resources fail to investigate and rush to judgment?  The answer is that the woman who complained was part of the pet team of RIMINI STREET's CHIEF EXECUTIVE OFFICER, SETH RAVIN.  She worked in RIMINI STREET's Las Vegas headquarters.   CEO RAVIN was based there too. RAVIN had made no bones about his affinity for the Vegas office and the team he protected. The woman who complained was part of that team. The man she complained about was not.  He had been hired by others much later and, in fact, never met RAVIN.

35.     As noted, Plaintiff was sternly rebuked by the head of Human Resources, JULIE MURPHY because her investigation "went too deep."  Plaintiff was ordered to turn over all of her investigation documentation.  What followed was text book retaliation.

36.     First, Plaintiff's boss gave her a low bonus.  Up until this point, Plaintiff had always received positive performance feedback and 100% of her bonus targets.  When Plaintiff asked why her bonus was low – the first one since MURPHY told her she had gone "too deep" – her boss told her that suddenly there was a negative "perception" about her leadership.  When Plaintiff pressed him for details and support for that statement, he could provide none.  Her boss, of course, could

PLAINTFF'S COMPLAINT

not point to any objective performance issues because Plaintiff, as she had throughout her tenure at RIMINI STREET, had met and exceeded those.

37.     Next, Plaintiff's boss steadily iced her out.  He missed many of their regularly scheduled meetings, whereas prior to Plaintiff going "too deep" he had consistently made those meetings.  He also went silent on other business-related matters.  Further, Plaintiff received not a word regarding her investigation or what happened since she turned over her documentation as ordered.

38.     In addition, Chief Human Resources Officer JULIE MURPHY intervened to stop the promotion of a woman supported by Plaintiff.  Plaintiff had already sought *and obtained* approval for the promotion.  MURPHY, however, stepped in a killed the promotion.  MURPHY said the woman had not been with the company long enough to be promoted.  Yet, MURPHY had supported the promotion, not once but twice, of woman, who had been with the company less time than the woman supported by Plaintiff.  The difference?  The woman promoted *twice* in even less time was hand-picked by CEO RAVIN, whereas the woman whose promotion MURPHY killed reported to Plaintiff and was interviewed in the investigation.

39.     In the final blow, just a few months since Plaintiff had gone "too deep," she was summarily fired.  Plaintiff called her boss for what was scheduled as a routine 1:1 meeting. When Plaintiff joined the call, however, her boss advised her that a junior member from the Human Resources Department was also on the call, i.e., one of JULIE MURPHY's underlings.  Plaintiff was told that she was fired effective immediately.  Neither her boss nor the woman from Human Resources provided any specific reason.  Instead, they told Plaintiff that she was no longer a good "fit."  A more vague reason is difficult to imagine, especially given Plaintiff's track record of nothing but successful, objective results at RIMINI STREET.  Indeed, if Plaintiff was such a bad

PLAINTFF'S COMPLAINT

"fit," why did RIMINI STREET award her 100% of her bonus targets for each and every one of bonus cycles occurring before Plaintiff "went too deep"?

### FIRST CLAIM FOR RELIEF
**(Retaliation in Violation of Title VII)**

40.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

41.     Plaintiff engaged in protected activity by, inter alia, investigating and reporting on an investigation into a claim of sexual harassment in the workplace.

42.     RIMINI STREET was aware of such protected activity because Plaintiff reported her investigation directly to members of RIMINI STREET management.

43.     Because of Plaintiff's protected activity, RIMINI STREET took adverse employment actions against her, including awarding a low bonus and terminating her employment.

44.     Plaintiff has suffered damages as a result of RIMINI STREET's discrimination, including the value of said salary and bonus compensation as well as losing the right to her equity grants.

45.     Plaintiff further suffered emotional distress and humiliation.

46.     Further, RIMINI STREET acted with malice and/or reckless disregard for Plaintiff's rights thus rendering punitive damages appropriate.

47.     Plaintiff is also entitled to reasonable attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF
**(Retaliation in Violation of Public Policy)**

48.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

49.     Plaintiff engaged in protected activity by, inter alia, investigating and reporting on an investigation into a claim of sexual harassment in the workplace.

PLAINTFF'S COMPLAINT

50.     RIMINI STREET was aware of such protected activity because Plaintiff reported her investigation directly to members of RIMINI STREET management.

51.     Because of Plaintiff's protected activity, RIMINI STREET took adverse employment actions against her, including awarding a low bonus and terminating her employment.

52.     Plaintiff has suffered damages as a result of RIMINI STREET's discrimination, including the value of said salary and bonus compensation as well as losing the right to her equity grants.

53.     Plaintiff further suffered emotional distress and humiliation.

54.     Further, RIMINI STREET acted with malice and/or reckless disregard for Plaintiff's rights thus rendering punitive damages appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court for the following relief:

    a.  Economic damages for past lost wages and benefits and future lost wages and benefits in an amount to be proven at trial;

    b.  Damages for emotional distress and humiliation in an amount to be proven at trial;

    c.  Punitive damages in an amount to be proven at trial;

    d.  Prejudgment interest;

    e.  Attorneys' fees and costs pursuant to statute; and

    f.  For such other relief as the Court may deem just and proper.

PLAINTFF'S COMPLAINT

1

## <u>JURY DEMAND</u>

2

PLAINTIFF DEMANDS A TRIAL BY JURY.

3

Executed this 19th day of March 2021.   By: *Seth R.*

4

5

SETH A. RAFKIN (199166)
(srafkin@rafkinesq.com)

6

JENNIFER M. BOGUE (259431)
(jbogue@rafkinesq.com)
**RAFKIN ESQ., PLLC**

7

1201 SUSSEX TURNPIKE, SUITE 102
RANDOLPH, NJ  07869

8

Telephone:      (973) 891-3370
Facsimile:      (973) 920-9727

9

*Attorneys for Plaintiff Dorothea Stoll*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTFF'S COMPLAINT